Good morning. When your case is called, please approach the podium, state your name, and whom you represent. This is a recording device, so please keep your voice up. We will allow 15 minutes per side. Please try to get to your strongest arguments first. We have read everything you've given us, and you've given us a lot. So get to your strongest arguments first. The athelon should save a few minutes for rebuttal. We're not strict clock watchers, but if you're going on too long, I'll ask you to stop. So whenever you're ready, please call the first case. Good morning. Case number 14-1033, People v. Herman Burnett. Good morning, Your Honors. I'm Jennifer Bonsiger from the Office of the State Appellate Defender for Herman Burnett. Good morning, Counsel. Good morning. Assistant State's Attorney, Lisanne Pugliese, appearing on behalf of the people of the state of Illinois. Good morning, Counsel. Whenever you're ready. Thank you. Again, good morning. May it please the Court. I'm Jennifer Bonsiger, again for Herman Burnett. Herman Burnett is a deeply mentally ill man whose numerous afflictions constantly impact his perceptions and his behavior. Despite that, the trial judge at every turn in this case thwarted the defense's efforts to put forward a defense, any defense at all. I planned to focus my argument this morning on the second issue in the briefs, the judge's complete denial, complete refusal to allow the defense to raise an insanity defense on Herman's behalf. And I would like to reserve a few minutes for rebuttal. Herman's mental illnesses are well-documented. His mental health history, going back more than 20 years, reveals diagnoses and ongoing treatment for schizophrenia, auditory hallucinations, psychotic thought disorder, delusional thought, I'm sorry, delusions and disordered thought processes, among other things. For this case, he was examined several times for fitness, at once found unfit at one point, and was fit for trial only with psychotropic medications being administered. His delusional and disordered thought process parades the record. And yet the trial judge refused to allow the defense to put on an expert on Herman's behalf for the sole reason that she would not be providing an opinion that Herman was, in fact, insane at the time. But that's not the standard. What is the standard? It's merely one of relevance, whether her testimony would have helped the trial effect determine any fact at issue. Here, her testimony was relevant to Herman's mental state, because Herman's not an average rational defendant describing what happened. His account of the events have to be viewed through the lens of his delusional preoccupations and his hallucinations. Is it your position that the court erred by not allowing the insanity defense, or that the court also erred by not allowing evidence that he was insane at the time of the offense? I'm sorry, fitness for trial versus insanity at the time of the offense. Are you going on both or just one? I'm sorry, I got mixed up with the end of your question there. The entire denial of the insanity defense or the refusal to disallow the expert opinion. But did evidence that he was – is there a fitness for trial issue moving around here? Well, we did raise in the first issue – Different things. Right. He was found repeatedly fit with medications. He was once found unfit. There were several questions of his fitness still on the record. In the fourth issue that we raised in the briefs, Herman several times on the record gave indications that he at the very least was probably not getting his medications. He spoke some very crazy things, piping up to ask about bonds and talk about being black and an islander. Well, there's an issue here, isn't there, that he didn't get his third dose of medication on the date of the incident and he was questioned at the police station. Right. Not being medicated at that time. Right. He mentioned that he was mentally ill to the investigators, that he took medications. He talked about going to the medicine place, whatever that means. And the investigator did admit that she – neither she nor her partner looked into getting him any of his medications or looked into getting hold of any of his records. He did self-report. That's another thing that the expert was ready to discuss, why Herman gave certain responses to the investigator, why he talked about previously being found NGRI, because he had been previously found NGRI. He was schooled in, you know, certain court processes, which is why he gave certain responses during that interview. Counsel, I'm not sure if you answered Justice DeLort's question. I just realized that. Was there a question of fitness for trial or not? Yes. I mean, there was always an ongoing issue of his fitness for trial, and we did not raise a separate argument that he was – Didn't all the three people who examined him find that he was fit for trial with medication? He was found fit for trial. He was found fit for trial by the county jail examiner. He was then found fit for trial – every time only found fit for trial with medication. Okay. So that's – we can assume that he was fit for trial with medication. Okay. So what's your – what's your contention about that particular thing? If he was fit for trial with medication, should the judge have said something else, said, well, no, he's not, or what? What exactly are you saying? She had a sua sponte duty to inquire into his ongoing fitness. She had an ongoing duty to do that. Because of the way he testified or because of what? Well, right before trial, when she asked him if he was ready for trial, he said, yes, you don't need no lighter, and she said, what, no? And then he says, they're feeding us on time, ain't no straws. That should have been an indicator for her to sua sponte inquire, at the very least, into whether he was receiving his medications. Even during his testimony. What's the temporal proximity between those statements and the last examination? The part about not needing a lighter and not having straws, that is after the final – after the last fitness determination of fit with medications and very shortly before trial commences. So your position is that those kind of statements suggest that the fitness evaluation may not have been still accurate? Or, at the very least, that he was not receiving the medications and the appropriate doses that he required to maintain his fitness for trial. Even during his testimony – during his trial testimony, he talks about giving a statement. He explained why he gave certain answers, because he, quote, didn't feel like Herman Burnett, because it was too dark, too much darkness was going on. Explaining that by darkness he meant, like, your breathing could have a lot of darkness on it. Your eyes could have a lot of darkness. Your ears. When he was asked on cross-examination if he used crack while he was taking Risperdal, one of the psychotropic medications he was on, he answered, no, just like some hospitals in bad areas, they do it to keep warm. He also described the lesion on the back of his head when he was asked about that as from other riffraff and from, you know, my source. How do we reconcile your position, as you've just expressed, about fitness for trial, with his own testimony at the trial? Which doesn't – which reads sort of a different way, doesn't it? He's more or less coherent at trial when he testifies. There's a few instances where he rears off a little bit and the judge has to rein him in, but that's not unusual for lay witnesses. I can't disagree – I mean, I can't agree with your characterization of his testimony. He responds to some questions. He does not do so in a linear manner. He gives very confused answers when he's asked about most things, in particular time. So do perfectly well people, you know, personal injury cases, divorce cases, no matter what. You know, they may not – the question may not cue the answer they want to be able to give, so they veer off. Sure, but, I mean, the reports I just read are all from his trial testimony, and being asked, were you taking crack along with your Risperdal? No, just like some hospitals in bed areas, they do it to keep warm. That's not just an answer that isn't quite what counsel was looking for. That's on a different planet, Your Honor. His testimony – he did occasionally answer questions when he was led to do so in a linear manner, but by no means was this – was it particularly coherent. And I'm sorry, you were starting to ask about how to reconcile that with – No, I think you answered. Counsel, what about the question of his sanity at the time that the offense was committed? When was that addressed, and how was that addressed? Well, it would have been addressed if the defense had been allowed to call. She was not going to provide an opinion on his sanity, but she would have described how his mental illness is. But isn't that important? His sanity at the time that he committed the offense, isn't that like the crux of what's going on? That's what people – that's what the jury would want to know, I would assume, was he sane or not sane when he killed this person. And that was – that should have been a question for the jury to decide, given the context provided by the expert's testimony. They also consider, you know, Herman's testimony. They also considered the State's expert that was called in rebuttal. I mean, the State conceded below that expert testimony on sanity was relevant by calling their own expert. The judge seemed to believe it relevant, too, finding no explanation other than he wasn't going to say he was – she wasn't going to say he was insane. Did anybody specifically ask Dr. what kind of – Salzberg. Yeah, who was to opine on his sanity at the time the offense was committed? No, she was not asked to opine on his sanity. She – to give an opinion on his sanity at the time. Why not? I mean, wouldn't that be something that you think would be important? It's – I mean, given that it's not necessary to prevent – I'm sorry – to present an opinion on sanity to – in order to instruct a jury to raise the defense at all. It's not required. A jury can base – I'm not quibbling about whether it's required. I'm just asking whether it would have – what would it have – would it have hurt anything to ask her to opine as to whether or not he was insane or – sane or insane at the time that he killed the victim? I mean – I don't know. I would guess based on the written proffer of her testimony that she simply did not have enough information from the immediate – you know, what exactly he had taken that day, what drugs he had taken. I'm just – I'm just surprised that nobody thought to ask her that because that seems pretty important to me. Okay. Go ahead. It may not be a question. Justice Marshall. I just want to break it down and maybe if we could – your insanity defense argument comes to us in I think three ways. The failure to give an instruction, a failure to – or maybe four ways. Failure to allow the testimony of Dr. Sussberg and the voir dire and the opening statements. So if we – even if we assume error, what is the standard of review on each of those issues? I would say that the jury instruction is that we go to whether or not – assuming there was error, what is the standard? Isn't it that the state would have to – has the burden then of showing that – If believed, the evidence would allow the jury to conclude by clear and convincing evidence that he was insane at the time, that he lacked substantial capacity to appreciate the criminality of his conduct. Okay. So let's take that. The evidence from the state's witness is that he was not – he was legally sane at the time. Right. Correct. And even though expert testimony is not necessary to give the instruction, we do have some expert testimony that the jury heard. So would there really have been a difference in this case if the jury had been instructed? Absolutely, Your Honor. And how do we come to that conclusion? Well, with the written proffer and the on-the-record assertions regarding what Dr. Sussberg would have testified to, she would have rebutted Dr. Cooper on some points, filled in gaps that Dr. Cooper did not address. He didn't address, for example, Herman's auditory hallucinations, his delusional thinking. She would have provided a gradual explanation for why Herman gave certain answers to the state police investigators, why he talked about being insane, which the state used to argue consciousness of guilt, when, in fact, when you're dealing with someone so deeply mentally ill, who is dealing with such delusions, generally means something else entirely. It would have given context to everything he said to the investigators. It would have helped to give context to his testimony itself as well. And it would have reminded the jury to realize that they had to view the evidence, or that at least one option for viewing the evidence was through the lens of his serious delusional thought processes. The written proffer from Dr. Sussberg repeatedly emphasized her interactions with him. He was preoccupied with these delusional thoughts. He talked about demons. He had religious delusions. None of that is addressed in Dr. Cooper's testimony. The jury was deprived of a full toolbox for determining this case and what should have been the ultimate question before them. But she still would not have testified, the defense expert, that he was legally. Right. But that's ultimate. I mean, that's a question that was her opinion. A jury is welcome, is free to accept or reject experts on either side. They can base, and juries are known to base their conclusions on simply occurrence witness testimony alone, lay witness testimony alone. They can reject expert test conclusions and testimony. And that's why I think, you know, courts repeatedly say that a conclusion or an opinion on insanity is not necessary. It's common to allow psychiatric witnesses to testify as to a defendant's mental state, as to his mental illnesses, and how those affect his mental state. And that's exactly what the jury was deprived of here. They got one one-sided expert. They got Herman's very confused testimony and nothing to give it context. And so does that all fall in place then when you talk about the failure to allow voir dire and statements, an opening statement, and allow this defense expert to testify? We then, it goes to, we have to determine whether that was A, an abuse of discretion, and B, whether it was prejudice. Is that correct? Right. And obviously there was an abuse of discretion here. The judge was simply wrong in the law. And making a mistake of law is automatically an abuse of discretion. I'm sorry. I think we're out of time. I'm sorry. I think Justice DeLoy. Since we're close on time, let me ask you about the first issue, which is the sufficiency of the evidence. Sure. For the crime of vehicular hijacking. You know, the parties in this case are dancing around a series of precedents. Some of which say you're close enough to the vehicle and some of which say you're not close enough to the vehicle to sustain a conviction for this crime. Right. In this record, we have the testimony of only one eyewitness. Warren Mitchell. And we have the testimony of the defendant who, of course, was present. Right. And you take the position that the evidence, keeping in mind the standard of review, which we have to apply to it, we have to draw reasonable conclusions, et cetera, et cetera, that the evidence still is not sufficient to support the contention that the victim was sufficiently proximate to the vehicle. Right. All right. I'll just ask you to talk about that for a moment. Because the problem I concern I have with that particular facet of your argument is the standard of review that we have to apply here. I mean, we do have the eyewitness saying that, you know, that while the victim was not, like, touching the vehicle when Mr. Burnett got in the vehicle. I mean, you know, we had this sort of vagueness about how close was he. Was he in the? He was in the convenience store. The convenience store. We don't have a lot of information as to how close the vehicle was to the door of the convenience store. It could have been right in front of it, for all we know. I mean, there's a window on it. Isn't that good enough? Not at all. Okay. Not at all. And the taking was complete by the time he jumped onto the van. He's inside the convenience store. I do think Satchel testifies that it's, like, 20, 25 feet away from where the van is. He was 20. Satchel was 20. Oh, perhaps I misspoke. I'm sorry. And where do you get the evidence that he was in the convenience store? Is that the defendant's statements to the police? No. No, because Herman has no idea until someone's banging on the roof that there's anyone running after the van. So then where is the evidence that the victim was in the convenience store? That's what Satchel told Investigator Thien. He was inside the convenience store. Is that not what he testified to? He waffled a bit in his testimony. I think he said both that he was and was not inside or just outside or something like that of the convenience store. But it was confirmed that he, in fact, immediately after the event, told Investigator Thien that Holmes, I believe, is inside the convenience store. I'd also say that as to the knowing elements, like, you know, he has to knowingly or intentionally take this vehicle, you know, Herman's testimony, he says he's, you know, he believes he's renting this vehicle from Source, the drug dealer. But the jury's entitled to disbelieve their testimony, isn't it? Sure. Sure. But I just want to note that Source is also what Herman calls the lesion on the back of his head. So this could have all been a delusion defeating. It's just as likely that it's a delusion defeating that knowing or intentional mental state. And I'm sorry, I'm well over my time at this point. Thank you. Thanks. May it please the Court. The defendant did not. Say your name again, please. Oh, I'm sorry. Lisa. Assistant State's Attorney Lisa Ann Pugliese. The defendant did not sufficiently raise the insanity defense. The trial court probably. What's the standard for raising the insanity defense? I asked your opponent, so I'm asking you. Yes. What's the standard? The standard is the defendant needs to provide some evidence. Okay. Let's stop right there. Do you think he provided some evidence? Didn't he certainly try to and got turned down at every chance? All the defendant provided to this court was that he had suffered a mental illness. Is that some evidence, counsel? He provided some evidence of mental illness, but mental illness alone does not equate to insanity. What the defendant did not do. I'm not asking you about whether he was insane. I'm asking you did he provide some evidence? Yes or no? No, he did not. And you don't think that the fact that he said to the court, I have a mental illness, you don't think that's some evidence? That's some evidence of part of the evidence he needed to present. What about all the goofy things that he was saying? I use goofy because when you read it, that's what it is. What about all that? Is that some evidence that there was something not quite right? If you're referring to the comments on those three hearings where he made those. I'm referring to the comments that are scattered throughout the record where he was talking tangentially. The judge would ask him one thing and he would answer something else. I'm sure you're as familiar with the record, if not more so than I am. There were lots of comments like that. What about those? Are those some evidence? Those comments relate to, and what the defendant raised, relate to his fitness to stand trial, which he was found fit with meds. But we need to look at now what evidence the defendant presented on the date of the offense. Is that the standard? Yes. Some evidence of insanity that he was unable on that date to appreciate the criminality of his conduct. When he said to the judge, I have a mental illness, would that suggest that maybe on the date of the offense, that maybe he was, that there was some evidence that he wasn't quite sane? Well, it was okay to concede, you know. Pardon me? No, I do not say I'm not. That's not the people's position. The defendant presented a history of mental illness. But that is not enough to enable the trial court to give the jury the instruction. The defendant did nothing to connect a prior mental defect with his behavior on the day of the offense. In fact, the defendant's own testimony — Was he required to do that? Yes. Did he have to do something to connect his current mental state to his mental state on the day of the offense in order to convince the judge that there is, quote, some evidence? Is that what you're — Well, otherwise, any defendant with a mental illness or a prior mental illness would request an insanity instruction without showing any further evidence that he affected his behavior. Just confining our analysis to this case, is it truly your position that this defendant presented nothing that qualifies as some evidence? He did not present — I just want to be clear. That's the people's position. And if we look at what the defendant, in fact, testified to on the day of the offense, it shows that he, in fact, did appreciate the criminality of what he did. He knew exactly what was happening. And by his own words, he said that he panicked and he lost control of the van. Nothing related to that his mental defect in any way affected his behavior on that day. He knew what he did after he crashed the victim into the wall. He not only fled the scene, but he continued to lie to the officers on the scene that he wasn't driving. He lied to the investigators once he got to the station. Then again, he wasn't driving. Someone else was driving. And then he gave a fake name to further evade the invest — to circumvent the investigation. Well, let me ask you another question, which is what your opponent raised. The jury was entitled to hear, according to your opponent, both sides. Your opponent claims that some of those actions that he took could have been the result of the delusional thinking and the hallucinations and all the other mental problems that he was suffering. Shouldn't — couldn't you see some merit to the argument that maybe all of this stuff should have been put before the jury and let them decide, is he just lying and trying to get out of it, or is he — or is this guy really suffering from some mental defect? What would have been the harm of allowing the jury to hear that? That's — maybe that's my basic question. I respect that the standard is not what is the harm. The standard is the evidence the trial court had before it was an abuse of discretion to deny the instruction. And you've already established that you think that there was some — there was not some evidence, and your opponent thinks that there was. So, you know, but you're flipping back that there was no evidence. Right. But assuming hypothetically that there was some evidence, what would have been the harm of allowing the jury to hear this? Well, it's the people's position that even if the jury did receive the instruction, no reasonable jury would have determined that there's clear and convincing evidence that this defendant was insane. We'll never know that, though, because we never gave the jury the chance to hear. So how would we know that? And, you know, taking this to the next step, Ms. Pugliese, explain to me how it's justifiable for the trial court to allow Dr. Cooper to testify for 60 pages of transcript that he was sane and then doesn't allow Dr. Salzberg to testify at all regarding any diagnosis she made of the defendant, which tends to shed an unfavorable light on Dr. Cooper's testimony. Isn't that sort of part of the adversarial process that we missed here? Well — The judge just shut the door to Dr. Salzberg. Right. Said, sorry, I'm not even going to let her testify one peep. And the reason it was not an abuse of discretion, because at the point when Dr. Salzberg would have been asked to testify, the defendant had already addressed his mental illness, discussed his 10 years of mental illness, and the defendant argued they wanted Dr. Salzberg to testify just to buttress the defendant's credibility regarding his mental health. That's all that Dr. Salzberg could have testified to, because there was no opinion from Dr. Salzberg regarding the defendant being sane or insane on the date of the offense. We're not dealing with the initial case where we have a witness who actually had the chance to take the stand and be examined. All we have from Dr. Salzberg is an offer of proof in writing unsigned by Abishi Cunningham, the public defender. That's what it is. Right. And the trial court said, no, I'm not going to let her testify, but then lets Dr. Cooper testify for 60 pages. Right. And at that point, because the defendant himself did not present some evidence of insanity at that point, it was irrelevant for Dr. Salzberg to then again testify to the mental illness, when there was no connection or not enough evidence to actually give that assertion. But Dr. Salzberg diagnoses him with all sorts of mental disorders. In the offer of proof, it does not specifically say, I find he was insane at the time of the offense. Correct. I understand that. Yes. But we have Dr. Cooper who gets to go in front of the jury and go on, as I said, for 60 pages that he's sane, sane, sane. Right. And at that point, people had not addressed the mental state, obviously, in the people's case in chief, and when the defendant had put that at issue when he testified his mental illness, it was appropriate in rebuttal for Dr. Cooper to put that mental illness in context with regard to, you know, the mental illness itself is not enough alone to establish insanity or that he couldn't understand the criminality of his conduct and the date of the offense, where Dr. Cooper was able to testify to the defendant's mental state regarding his culpability and the date of the offense, which is significantly different than what Dr. Salzberg was able to offer at that point. Well, we don't know what she was – because – Well, the defendant – – the very slim offer of proof. I see your point. Right. Maybe it was deliberately slim. Maybe she was – maybe she told the public defender, I will not opine what you want me to opine. Well, if you recall in the record, the state's attorney did make a comment to the court that after speaking with Dr. Salzberg, the doctor indicated that the insanity opinion would not place in the report because it was not favorable to the defense. So, you know, without having the doctor saying that directly, that's – the record indicates that that was the case. Well, what would it have hurt to put her on the stand and then ask her that? You know, you don't like the question of what would have been the harm, but I'm going to just, I guess, ask the question. And what would have been the harm of allowing Dr. Salzberg to testify? And again, even if the doctor did testify, the defendant did not provide some evidence to allow the instruction. So in the end, that would have been irrelevant to the insanity defense anyway. And it was harmless that it was not brought in. Well, the jury never considered it where the defendant did not provide sufficient evidence to allow that instruction. Okay. Well, let me go back again because – and I did find the case I wanted to get a burden of proof here. This error in – let's assume there was an error in the instruction because she did – an error could be found in the fact that the judge made an error of law. The standard regarding the jury instruction? Right. Well, the court did make a comment that Sarah McKenzie Gavin needed to be provided to her prior to giving the instruction. Well, and that an expert was needed. Well, you know, while the defendant does – I think that's a – the defendant misrepresents – misapprehends what the trial court stated. If you look at the jury conference, the trial court clearly stated that she did not – that an expert was not required for her to offer the instruction if the defendant did provide some evidence. Throughout the trial, the court noted that there was no expert saying the defendant was insane, but she clearly stated at the conference that one was not required. Okay, but it's a harmless error analysis, right? And an error on instruction. Well, right. Abusive discretion and then the people would argue that it was harmless, that it wasn't given. It would be your burden to show that it's harmless error. That's the – I see what you're – If there's error in the jury instruction, a new trial would be warranted if the error was not harmless, correct? You would offer that even if the jury instruction – – that it was harmless, where no reasonable jury could have provided – or could have found by clear and convincing evidence the defendant was insane. Defendants of testimony refused that he was insane. A reasonable jury would not have come back with that conclusion based on the evidence. And even with regard to your comment regarding the standard – I'm sorry, go ahead. What could a reasonable jury have made contrary finding if Dr. Salzberg had taken the stand and the jury would have been informed of her diagnosis such as it was in the offer of proof? Well, the jury had a very clear picture of the defendant's mental illness. From him, you know, even Dr. Cooper got into it. There's no question the defendant had mental illness. A defendant's own opining about his mental state is nowhere near as convincing to a jury as a physician's, isn't it? Right. But even with the mental illness, that still is not enough. Simply a defendant providing that he at some point had a mental illness or he still had the mental illness, you still need to show he couldn't understand the criminality of his conduct. And that simply was not done in this case. There was no proof that that is the case. His own testimony refutes that where he says he panicked. This is my situation where he said he didn't know what was going on. I heard demons in my head. I panicked. I thought someone was out in the car and he magically crashed into the wall. There's nothing showing the defendant did not understand the criminality of his conduct and therefore any error in this would be harmless. We submit it wasn't an error to not provide an instruction based on the evidence proffered, but if so, it was harmless. Ms. Pugliese, let me, before your time expires, ask you again about the sufficiency of the evidence side of the case. Okay. All right. Wasn't the crime of vehicular theft or whatever the technical term is, not hijacking, the lesser crime, you know, the... Possession in a stowaway vehicle. Yeah. Does that mean... TSMV. TSMV. TSMV, complete when the car started in motion, all right? Thereby eliminating the possibility we could have a valid conviction for vehicular hijacking because the evidence was that the victim did not start progressing. The victim had no reason to go to the vehicle until he saw it moving away, at which point that crime, TSMV, is completed. So how do we get a vehicular hijacking out of this? The vehicular hijacking obviously started when the defendant got in the car and started to drive off. The defendant was close enough to jump on the car. The defendant... Do we know the defendant was close enough to jump on the car? You mean the victim. I'm sorry. The victim was close enough to the car to jump on the car as it started to take off. He didn't have to chase it down. He jumped on the car as it started pulling away, and he was on the car as the defendant was taking the car and was never dislodged until he crashed into the wall. So it's our position that, yes, the taking continued from the beginning when the victim was close by, excuse me, and when he was continuing to hold on to the car. And if you look at people who cipher, it's a similar situation, vehicular hijacking, where there the car drove by the victim, and then the victim approached the car, held on to the handle while the defendant drove away, and that court found that the victim was in the immediate presence and it was taken from this person. Similarly to here, where it was taken from his immediate presence and then from this person as he was holding on to the vehicle. So it's our position that a jury would not have found him guilty of PSMV, not guilty of PSM... I'm sorry, would not have found him guilty of PSMV and not guilty of vehicular hijacking based on the taking. Thank you. Brief rebuttal, counsel? Just a few quick points. Your Honors, we're asking about, in particular, Justice Rockford, you were asking for the standard on the instructions, and I urge this Court to follow its previous opinion in People v. Dwight, where this Court found that the fact that there was evidence sufficient to instruct the jury on insanity demonstrated prejudice in the judge's refusal to do so. Yeah, I don't know if Dwight talked to... I'm looking at People v. Thoreau as to, you know, how to review jury instructions. So I don't know if Dwight kind of followed that, but... I'm sorry, Thoreau, Your Honor? It doesn't deal with an insanity instruction, but it does set forth whether or not we should grant a new trial when there's been an error in a jury instruction. I'm sorry, I don't have that case. It talks about the harmless error and the State's burden, and I think the State... Sure. Yeah, thank you. Nevertheless, I urge this Court to follow Dwight. If there are no other questions, thank you. Okay, thank you very much, counsel, for your presentation. This Court will take the matter under advisement, and we are adjourned.